# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE
NEWS RELEASE #018

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **1st day of May, 2026** are as follows:

**BY Hughes, J.:**

**2025-KA-00896**     ***STATE OF LOUISIANA   VS.   MAYA JONES (Parish of Terrebonne)***

AFFIRMED AND REMANDED. SEE OPINION.

Retired Judge Jeanette G. Garrett appointed Justice ad hoc, sitting for Weimer, C.J., recused.

Retired Judge Robert A. Chaisson appointed Justice ad hoc, sitting for Justice pro tempore Penzato, recused.

McCallum, J., dissents and assigns reasons.

Griffin, J., additionally concurs and assigns reasons.

Cole, J., dissents for the reasons assigned by Justice McCallum.

SUPREME COURT OF LOUISIANA

No. 2025-KA-00896

STATE OF LOUISIANA

VS.

MAYA JONES

On Appeal from the 32nd Judicial District Court, Parish of Terrebonne

**HUGHES, J.**[1]

This matter is before us on a challenge to the constitutionality of La. R.S. 15:168(E)(3), which prohibits courts from ordering the payment of funds administered by the Office of the State Public Defender or district public defender. The district court held that the statute was unconstitutional in violation of Louisiana Constitution Article 5, § 16(A), which gives exclusive original jurisdiction of felony cases to district courts. We affirm the district court's judgment and remand for further proceedings.

## FACTS AND PROCEDURAL BACKGROUND

On August 1, 2022 a grand jury indicted the defendant Maya Jones, along with co-defendant Jermaine Michael Robinson, for first degree murder in violation of La. R.S. 14:30 and obstruction of justice by tampering with evidence, a violation of La. R.S. 14:130.1(A)(1).[2] The charges stem from the death of Ms. Jones's two-

---

[1] Retired Judge Jeanette G. Garrett, appointed Justice *Ad Hoc*, sitting for Chief Justice Weimer, recused. Retired Judge Robert A. Chaisson, appointed Justice *Ad Hoc*, sitting for Justice Allison H. Penzato, *Pro Tempore*, recused.

[2] Ms. Jones filed a Motion for Severance, and in September 2023, the charges against Ms. Jones were severed from those against Mr. Robinson.

year-old son. Ms. Jones entered a plea of not guilty to both counts. The State filed a Notice of Intent to Seek the Death Penalty, however the State has indicated in its September 2025 brief to this court that the death penalty was "recently withdrawn."

Numerous pre-trial motions were filed, including Ms. Jones's November 2024 Motion for Expert Funding in Relation to Change of Venue. In her motion, Ms. Jones asserted that she requires an expert to conduct community polling and analyze community attitudes to show her need for a change of venue, and without an expert she would have a claim for ineffective assistance of counsel.[3] Ms. Jones sought funding for an expert under the Louisiana Capital Defense Guidelines, LAC 22:XV, Chapter 9, § 913(B)[4] from the Office of the State Public Defender (OSPD), but her request was denied. Her request for reconsideration was also denied.

The district court conducted several hearings on Ms. Jones's request for expert funding, including one in January 2025 at which Remy Starns, the state public defender, testified. According to Mr. Starns, he is tasked with the responsibility "to administer the system in an efficient and fiscally responsible manner, while respecting the *Strickland v. Washington*[5] standard . . . to provide effective

---

[3] Shortly after filing the motion, Ms. Jones filed a Motion for Change in Venue. Her motion was based on pretrial publicity, including an Amber alert that was issued when Ms. Jones reported her child missing, and subsequent media attention to the case after the child's body was discovered in a garbage can and surveillance video was released allegedly showing Ms. Jones and Mr. Robinson carrying the child's body in a duffel bag before they disposed of it.

[4] Louisiana Capital Defense Guidelines, LAC 22:XV, Chapter 9, § 913(B) provides:

> B. Expert, Investigative and Other Ancillary Professional Services
> 1. Counsel shall have access to the assistance of all expert, investigative, and other ancillary professional services reasonably necessary or appropriate to provide high quality legal representation at every stage of the proceedings.
> 2. The state public defender shall provide funds for the assistance of experts, including mitigation specialists, and extraordinary investigative services. . . Funds for ordinary investigative services will be provided by the district public defender unless responsibility for the case under § 905 is vested in the state public defender.

[5] *Strickland v. Washington*, 466 U.S. 668 (1984).

assistance of counsel to all the persons [the office] represents."[6] He testified that under the Louisiana Public Defender Act, La. R.S. 15:141, et seq., his office is given "plenary authority over all aspects of the public defender system." When a request for funding for an expert witness is received, his office evaluates it on a case-by-case basis, taking "into account all of the factors that each request asks us to do." After this "deliberative process," his office determines whether to approve the request.

At the conclusion of the hearing, the district court determined that the assistance of the requested expert was "necessary and . . . likely in order for the defendant to be able to present its motion. . . . The Defense has shown to the Court that it meets the *Touchet*[7] standard." The district court deferred ordering the payment of expert fees, finding that it was barred from doing so by La. R.S. 15:168(E)(3). Subsection (E) states:

> E. (1) Notwithstanding any provision of law to the contrary, each judicial district is allowed to accumulate funds for the purposes of retaining expert witnesses. The district public defender, in his discretion, shall determine how payments shall be administered and which experts shall be paid.
> (2) Any person who has retained private counsel but is found to be indigent may apply for funds for expert witnesses in the same manner as public defender clients. Each person shall apply for the funds by making application to the district defender of the district having jurisdiction and shall be subject to the same requirements as indigent clients.
> (3) No court shall have jurisdiction to order the payment of any funds administered by the office or district public defender for expert witnesses, or for any other reason.

In February 2025, Ms. Jones filed a Motion to Declare La. R.S. 15:168(E)(3) unconstitutional. Finding that under the statute Ms. Jones "is left without a remedy for judicial review," the district court determined that La. R.S. 15:168(E)(3) violates

---

[6] As Mr. Starns indicated, his office is responsible for the defense of approximately 146,000 people annually in all sixty-four parishes and forty-two judicial districts, accounting for about 88% of all persons accused of crimes in Louisiana.
[7] *State v. Touchet*, 93-2839 (La. 9/6/94), 642 So.2d 1213.

"not only Article 5 of the Constitution but it also strips the defendant of her due process rights." The court stated:

> In regards to the funding of the indigent defendants and their effective defense, the constitution has not vested jurisdiction to another tribunal. And this law now specifically impedes the Court's exclusive jurisdiction over this felony case. State versus Maya Jones certainly is a criminal felony case. The Court has exclusive jurisdiction over the management of the case. And a law prohibiting the Court's ability to order payment upon proper and just cause being found by this Court directly impedes on this Court's ability to insure that justice is obtained.

The district court looked to this court's decision in *State v. Craig*, which indicated that "'even in the absence of legislative or executive authorization, a court may, when reasonably necessary, appoint counsel for an indigent and award the attorney a reasonable fee to be paid from a source which the court deems appropriate.'" *State v. Craig*, 93-2515, p. 10 (5/23/94), 637 So.2d 437, 445 (quoting *State In the Interest of Johnson,* 475 So.2d 340, 342 (La. 1985)). In *Craig*, this court found "no reason to differentiate the need for payment to an indigent's attorney from the need for payment of investigators and experts who assist that attorney, since . . . these persons assist the attorney in the preparation of an effective defense and help to make the attorney 'reasonably effective.'" *Id*. (quoting *State v. Peart*, 621 So.2d 780, 783 (La. 1993)).  Finding "the same to be true for the funding to provide an adequate defense of an indigent defend[ant]," the district court concluded that La. R.S. 15:168(E)(3) "strips the litigants of [the] right to seek review [of the denial of funding] and it states that no court shall have jurisdiction" as it "prohibits any court from hearing facts, weighing credibility, and rendering a judgment over the proper payment of such funds . . . . The Court's jurisdiction over the felony case that it's tasked with presiding over has been eroded away by this law."

The district court further found that the remedy provided in *State v. Citizen* (halting prosecution until adequate funding is found) is not adequate, particularly

4

where, as here, there are sufficient funds to pay for the requested expert.[8] *State v. Citizen*, 04-1841 (La. 4/1/05), 898 So.2d 325. To find otherwise would allow cases to be halted "without the courts even having any recourse," which would lead to "an absurd result." The district court thus found La. R.S. 15:168(E)(3) to be "clearly unconstitutional as it is in direct violation" of Louisiana Constitution, Article 5, including § 16(A)."[9]

A direct appeal was taken to this court by the State of Louisiana, and the Attorney General for the State of Louisiana intervened. *See* La. Const. art. 5, § 5(D) ("a case shall be appealable to the supreme court if (1) a law or ordinance has been declared unconstitutional").

## LAW AND DISCUSSION

The sole issue presented by this case is whether La. R.S. 15:168(E)(3) is unconstitutional.

**Standard of review**

A district court's judgment declaring a statute unconstitutional is reviewed by this court de novo. *See S. Silica of Louisiana, Inc. v. Louisiana Ins. Guar. Ass'n,* 07-1680, p. 8 (La. 4/8/08), 979 So.2d 460, 466. Under this de novo standard, "the court will decide the matter after considering the statute at issue, the relevant law,

---

[8] Mr. Starns testified that there is approximately $10 million in the Louisiana Public Defender Fund.

[9] Louisiana Constitution Article 5, § 16(A) provides:

> Original Jurisdiction. (1) Except as otherwise authorized by this constitution or except as heretofore or hereafter provided by law for administrative agency determinations in worker's compensation matters, a district court shall have original jurisdiction of all civil and criminal matters. (2) It shall have exclusive original jurisdiction of felony cases and of cases involving title to immovable property, except as provided in (3) below; the right to office or other public position; civil or political right; probate and succession matters; except for administrative agency determination provided for in (1) above, the state, a political corporation, or political subdivisions, or a succession, as a defendant; and the appointment of receivers or liquidators for corporations or partnerships. (3) The legislature may provide by law that a family court has jurisdiction of cases involving title to movable and immovable property when those cases relate to the partition of community property and the settlement of claims arising from matrimonial regimes when such action arises as a result of divorce or annulment of marriage.

5

and the record without deference to the legal conclusions of the courts below." *State v. Lee*, 22-1827, p. 4 (La. 9/1/23), 370 So.3d 408, 412.

**Constitutionality**

This court recently reiterated the well-settled principles to be considered in reviewing the constitutionality of a statute:

> "All statutory enactments are presumed constitutional." *Carver v. Louisiana Dep't of Pub. Safety*, 2017-1340, p. 5 (La. 1/30/18), 239 So. 3d 226, 230); *see also, Calcasieu Par. Sch. Bd. Sales & Use Dep't v. Nelson Indus. Steam Co.*, 2021-00552 (La. 10/10/21), 332 So.3d 606, 613-14; *State v. Hatton*, 2007-2377, p. 13 (La. 7/1/08), 985 So. 2d 709, 719. This presumption is based on the premise that "legislators are presumed to have weighed the relevant constitutional considerations in enacting legislation." *Carver*, 2017-1340, p. 5, 239 So. 3d at 230; *Greater New Orleans Expressway Comm'n v. Olivier*, 2004-2147, p. 4 (La. 1/19/05), 892 So. 2d 570, 573 ("Because legislators owe the same duty to obey and uphold the constitution as do judges, legislators are presumed to have weighed the relevant constitutional considerations in enacting legislation.").
>
> ****
>
> The presumption of constitutionality is significant; "[b]ecause of the presumption ..., in determining the validity of a constitutional challenge, a Court 'must construe a statute so as to preserve its constitutionality when it is reasonable to do so.' " *Carver*, 2017-1340, 239 So. 3d at 230; *M.J. Farms, Ltd. v. Exxon Mobil Corp.*, 2007-2371, p. 22, 998 So. 2d 16, 31. Additionally, "[b]ecause statutes are presumed constitutional, the party challenging the statute bears the burden of proving its unconstitutionality." *Fransen*, 2008-0076, p. 11, 988 So. 2d at 234; *see also, State in Int. of D.T.*, 2019-01445 (La. 4/3/20), 340 So. 3d 745, 748 (internal citations omitted)("'Statutes are presumed to be valid, and the constitutionality of a statute should be upheld wherever possible....' When a statute is challenged as being unconstitutional on its face, ... the moving party bears an especially heavy burden to establish that there is no other interpretation or circumstance under which the law would be constitutional.")

*Westlawn Cemeteries, L.L.C. v. Louisiana Cemetery Bd.*, 21-1414, p. 12-13 (La. 3/25/22), 339 So.3d 548, 559-60.

Any doubt as to whether a statute is constitutional is to be resolved in favor of constitutionality. *Polk v. Edwards*, 626 So.2d 1128, 1132 (La. 1993). The party challenging the constitutionality of a statute "must establish more than that the constitutionality of the legislation is fairly debatable. The opponent must establish clearly and convincingly that the constitutional aim was to deny to the legislature the power to enact the legislation." *Id*.

**Governmental powers; Separation of powers; and inherent powers of the branches of government**

The Louisiana Constitution of 1974 divides governmental power into three separate branches: legislative, executive, and judicial. La. Const. art. 2, § 1. The Louisiana Constitution explicitly incorporates the doctrine of separation of powers in Article 2, § 2, which states:

> Except as otherwise provided by this constitution, no one of these branches, nor any person holding office in one of them, shall exercise power belonging to either of the others.

As this court recognized in *State v. Lanclos*, Article 2 establishes "the basis for the recognition of inherent powers in the judicial branch which the legislative and the executive branches cannot abridge." *State v. Lanclos*, 07-82, p. 11 (La. 4/8/08), 980 So.2d 643, 651. Nor may the judicial branch abridge the inherent powers of the legislative and executive branches. *Hoag v. State*, 04-857, p. 4 (La. 12/1/04), 889 So.2d 1019, 1022. In addition, the constitution is violated "only if one branch of government or its members exercises power belonging to either of the others." *DeJean v. Purpera*, 15-1214, p. 7 (La. App. 1 Cir. 4/15/16), 199 So.3d 11, 16, *writ denied*, 16-1682 (La. 9/13/16), 206 So.3d 199 (quoting *State in Interest of A.C.*, 93-1125, p. 18 (La. 1/27/94), 643 So.2d 719, 731).

The origin of these principles is a "desire for each branch to act as a 'check' upon the other and . . . ensure a 'balanced' government." *State in Interest of A.C.*, 643 So.2d at 731-32 (quoting *Humphrey's Executor v. United States*, 295 U.S. 602

7

(1935)). While the separation of powers doctrine is "clearly and emphatically expressed in the Louisiana Constitution and must be maintained to its full extent," we have observed that "the exact line between judicial and legislative powers has never been delineated with absolute precision." *State v. Umezulike*, 03-1404, p. 4 (La. 2/25/04), 866 So.2d 794, 797.

Unlike the United States Constitution, which grants specific, enumerated powers to each branch of the federal government, the Louisiana Constitution does not grant powers. Instead, its provisions are limitations on the otherwise plenary power of the people, which is exercised through the legislature. See *Louisiana Fed'n of Teachers v. State*, 13-120, p. 21 (La. 5/7/13), 118 So.3d 1033, 1048. "Legislative power . . . is the authority to make laws, but not to enforce them," as that is an executive function. *State ex rel. Guste v. Legislative Budget Comm.*, 347 So.2d 160, 165 (La. 1977) (quoting *Springer v. Government of Philippine Islands*, 277 U.S. 189, 202 (1928)). Unless the Louisiana Constitution specifically limits or forbids an action, the legislature generally has the authority to act. *Id*. at 164. ("the legislature may enact any legislation that the constitution does not prohibit."). Indeed, the plenary power of the legislature is "the rule" and a limitation on the legislature's exercise of this power is the exception. *Williams v. Mumphrey*, 95-643, p. 6 (La. App. 5 Cir. 1/30/96), 668 So.2d 1274, 1277, *writ not considered*, 96-569 (La. 3/29/96), 670 So.2d 1240.

The Louisiana Constitution vests judicial power in the supreme court, the courts of appeal, and the district courts. La. Const. art. 5, § 1. Judges at each level of this hierarchy have the constitutional authority to issue all needful writs, orders, and process in aid of the jurisdiction of their courts. La. Const. art. 5, § 2. District courts have original jurisdiction of all criminal matters and exclusive original jurisdiction of felony cases, except as otherwise authorized by the Louisiana Constitution. La. Const. art. 5, § 16(A). Original jurisdiction is jurisdiction of the first instance. *Moore*

*v. Roemer*, 567 So.2d 75, 79 (La. 1990). The term designates the adjudicative tribunal in which the initial adjudication is made. *Id*. In addition, the Louisiana courts of appeal have appellate jurisdiction in all non-death penalty criminal cases arising in the district courts and have supervisory jurisdiction over cases that arise in the circuit. La. Const. art. 5, § 10. The Louisiana Supreme Court has general supervisory jurisdiction over all courts and exclusive authority to regulate the practice of law in this state. La. Const. art. 5, § 5.

In *Pope v. State*, this court opined that Article 5, § 16(A), "effectively limits the powers of the Legislature and precludes the Legislature from changing the original jurisdiction of district courts fixed by the Constitution." *Pope v. State*, 99-2559, p. 12 (La. 6/29/01), 792 So.2d 713, 720. In *Pope*, this court held unconstitutional a statute that required the Department of Corrections to take cognizance of a tort claim brought by prisoners at the inception of the action, try the claim, and pass judgment on the law and facts of the action, allowing for judicial review by a district court only on the record made before DOC officials. *Id.* at 716.

In *Meyer v. Board of Trustees of Firemen's Pension & Relief Fund for City of New Orleans*, this court wrote that if a statute is construed to deprive a party of a cause of action in a district court, the statute "would undoubtably make that part of the law unconstitutional." *Meyer v. Board of Trustees of Firemen's Pension & Relief Fund for City of New Orleans*, 6 So.2d 713, 715 (La. 1942). In *Meyer*, this court examined a statute giving a board the power to hear and decide all applications for relief, pensions, and death benefits, and making such decisions by the board final and not reviewable, except by the board itself. *Id.* While the statute was interpreted by the court to maintain its constitutionality, it relied on the state constitutional guarantee that every person shall have an adequate remedy by due process of law and justice administered "without denial" (now found in Article 1, § 2 and § 22) and

9

the constitutional provisions vesting the courts with jurisdiction. *Id.* at 716. The court reasoned:

> It would be most unusual, if not extraordinary, to hold that the Legislature intended that the Board, which is given the full power and authority to administer the pension fund, is the sole and only judge of the legal rights of the widow under the provisions of the statute and that its decisions would not be subject to review by the courts.

*Id.*

The judicial power of our courts is derived "from [either] an express constitutional grant or from inherent judicial power reasonably necessary for the exercise of their function as courts." *Umezulike*, 866 So.2d at 798. In *Konrad v. Jefferson Parish Council,* we explained the inherent powers of the judiciary:

> Under the doctrine of inherent powers, courts have the power (other than those powers expressly enumerated in the constitution and the statutes) to do all things reasonably necessary for the exercise of their functions as courts. The doctrine is a corollary of the concepts of separation of powers and of judicial independence, in that other branches of government cannot, by denying resources or authority to the court, prevent the courts from carrying out their constitutional responsibilities as an independent branch of government. The inherent power of the judiciary is a necessary concomitant to the judicial power, but pertains to the administration of the business of the court.
>
> The doctrine of inherent powers has been utilized to provide the power to punish for contempt, to adopt rules of practice, to regulate lawyer admission to practice and lawyer discipline, and to require the appropriation or expenditure of funds reasonably necessary for the court's functioning as a court.

*Konrad v. Jefferson Parish Council*, 520 So.2d 393, 397 (La. 1988); *see also Lanclos*, 980 So.2d at 651.

The Legislature codified the courts' inherent power in Louisiana Code of Civil Procedure Article 191, which provides that a court "possesses inherently all of the power necessary for the exercise of its jurisdiction even though not granted expressly by law." We observed in *Hoag*, however, "some inevitable overlap of the functions"

10

of the various branches of the government, and we cautioned that "each branch of government must strive to maintain the separation of powers by not encroaching upon the power of the others." *Hoag*, 889 So.2d at 1024. To that end, we emphasized that "the inherent powers of the judiciary should be used sparingly and only to the extent necessary to insure judicial independence and integrity." *Id.*

That is not to say that there are not times when the judiciary can invoke its inherent powers vis-à-vis legislation. In *Fisher v. Harter*, this court wrote:

> It must be recognized that, due to the fact that courts are not empowered to enact laws, legislation passed in aid of the courts' inherent power is generally approved, but the courts will not sanction any legislation challenged on the basis that it has the effect of divesting or stripping the courts of their inherent power. Thus, the Legislature may enact statutes in aid of the courts' powers, subject to the courts' approval, but legislation subverting the courts' constitutional power violates the separation of powers doctrine set forth in La. Const. Art. 2, § 2.

*Fisher v. Harter*, 24-359, p. 12 (La. 10/25/24), 395 So.3d 806, 816 (internal citations removed); *see also Singer Hutner Levine Seeman & Stuart*, 378 So.2d 423, 426 (La. 1979) ("This court will uphold legislative acts passed in aid of its inherent power, but will strike down statutes which tend to impede or frustrate its authority.")

**Rights of the Accused to a Defense**

The Sixth Amendment to the United States Constitution provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." As recognized in *Gideon v. Wainwright*, the Sixth Amendment to the federal Constitution provides that in all criminal prosecutions the accused has a right to assistance of counsel for his defense, and the Fourteenth Amendment makes this right obligatory on the states. *Gideon v. Wainwright*, 372 U.S. 335, 342-43 (1963); *see also* La. Const. art. 1, § 13 ("At each stage of the proceedings, every person is entitled to assistance of counsel of his choice, or appointed by the court if he is indigent and charged with an offense punishable by imprisonment."). As the U.S. Supreme Court stated in *Ake v. Oklahoma*, "[J]ustice

11

cannot be equal where, simply as a result of his poverty, a defendant is denied the opportunity to participate meaningfully in a judicial proceeding in which his liberty is at stake." *Ake v. Oklahoma*, 470 U.S. 68, 76 (1985).

As part of the state's obligation in providing effective assistance of counsel to an indigent defendant, it must furnish the indigent's defense counsel with all of the "basic tools of an adequate defense," at no cost to the indigent defendant. *Britt v. North Carolina*, 404 U.S. 226, 227 (1971). This court has long upheld trial court orders for payment of the services of investigators and expert witnesses, such as psychologists and mitigation experts, by the government. *See, e.g., Craig*, 637 So.2d at 448.

In order to receive funding for expert witnesses, an indigent defendant must establish that the expert assistance will be "necessary to the construction of an effective defense." *State v. Touchet*, 93-2839, p. 4 (La. 9/6/94), 642 So.2d 1213, 1215.

**History of Louisiana's Indigent Defense Counsel and Related Jurisprudence**

The way the state has structured and funded indigent defense counsel has taken many forms over many decades. Act 366 of 1966, which became La. R.S. 15:141, established indigent defender boards under the supervision of each judicial district, which oversaw matters like selection of counsel and rates of compensation, and established funding through costs taxed on those convicted. Enacted with the Louisiana Constitution of 1974 was Article 1, § 13, which states in part that the Legislature "shall provide for a uniform system for securing and compensating qualified counsel for indigents."

In 1985, this court was presented with the question of who, in the absence of a statute authorizing payment, should be required to compensate an attorney who was appointed to represent an indigent parent in a child abandonment proceeding.

*Johnson*, 475 So.2d at 341. In determining that the Department of Health and Human Resources (DHHR) was the appropriate body to pay, this court wrote:

> The separation of powers by our state constitution establishes an inherent judicial power which the legislative and executive branches cannot abridge. La. Const. Art. II. Among the purposes for which inherent judicial power may be exerted are the issuance of needful orders in aid of a court's jurisdiction and the regulation of the practice of law. La. Const. Art. V § 2, 5(B). In aid of these purposes, a court has the inherent power to require an attorney to represent an indigent, with or without compensation, as an obligation burdening his privileges to practice and to serve as an officer of court. The court's power to furnish counsel for indigents necessarily includes the power, when reasonably necessary for effective representation, to issue an order requiring the state, its appropriate subdivision, department, or agency, to provide for the payment of counsel fees and necessary expenses.
>
> The inherent judicial power may be aided by the legislative and executive branches, but their acts or failure to act cannot destroy, frustrate, or impede the court's inherent constitutional authority. Consequently, even in the absence of legislative or executive authorization, a court may, when reasonably necessary, appoint counsel for an indigent and award the attorney a reasonable fee to be paid from a source which the court deems appropriate.

*Johnson*, 475 So.2d at 341-42 (some citations omitted).

The *Johnson* opinion noted that a court must "act with comity toward the other branches of government and with sensitive regard for the concepts of functional differentiation and the checks and balances implied by the separation of powers doctrine" in determining what governmental body should pay the fees. *Id.* at 342. Important considerations for a court making this decision include: the structure and scheme of existing legislation which may be applied by analogy, the ability of an entity to budget and finance such expenditures, the entity's responsibility for incurring the need for legal services or for administering the program out of which the need arises, and the existence of any custom or informal practice regarding the payment of such fees. *Id.*

Following *Johnson*, the Legislature amended the statute to state that DHHR was not responsible for the costs of representation of indigent parents. In subsequent cases, Louisiana courts identified the indigent defender boards as the appropriate

source of funds. *See State in the Interest of S.C. v. D.N.C.*, 26,104 (La. App. 2 Cir. 6/22/94), 639 So.2d 426, 431, *writ denied*, 94-1977 (La. 11/4/94), 644 So.2d 1061.

The indigent defender system established in 1966 was kept in place for years, but by 1990 the Louisiana Supreme Court appointed a statewide Indigent Defender Board Committee of the state's Judicial Council to study its inadequacies. In 1993, this court wrote in *State v. Peart*:

> If legislative action is not forthcoming and indigent defense reform does not take place, this Court, in the exercise of its constitutional and inherent power and supervisory jurisdiction, may find it necessary to employ the more intrusive and specific measures it has thus far avoided to ensure that indigent defendants receive reasonably effective assistance of counsel.

*Peart*, 621 So.2d at 791; *see also State v. Wigley*, 624 So.2d 425, 430 n.5 (La. 1993) ("[C]ourts, in the exercise of their supervisory and inherent power, could authorize and require a higher payment" to an attorney assigned to represent an indigent defendant.).

In 1994, the Louisiana Supreme Court created the Louisiana Indigent Defender Board (LIDB) and passed Rule XXXI, which created a program for death penalty cases and an expert witness/testing fund, among others.

 Also in 1994, this court handed down the opinion in *State v. Craig*, which affirmed the inherent constitutional authority of the court to order the state to pay for counsel representing indigent defendants as well as investigators and experts assisting the defense. *Craig*, 637 So.2d at 440. The court reasoned:

> In *State In the Interest of Johnson*, 475 So2d 340, 342 (La.1985), we stated that the failure of a co-equal branch to properly designate and appropriate a fee for indigent defense counsel did not prevent same from being obtained by court order:
>
>> even in the absence of legislative or executive authorization, a court may, when reasonably necessary, appoint counsel for an indigent and award the attorney a reasonable fee to be paid from a source which the court deems appropriate,
>
> noting that this was a proper exercise of the court's inherent powers

> under the state constitution. In the instant case, we can see no reason to differentiate the need for payment to an indigent's attorney from the need for payment of investigators and experts who assist that attorney, since, as discussed earlier, these persons assist the attorney in the preparation of an effective defense and help to make the attorney "reasonably effective." *State v. Peart*, 621 So2d 780, 783 (La.1993).

*Id.* at 445. Upon reviewing La. R.S. 15:304 and La. R.S. 15:571.11, the *Craig* court determined that local city-parish funds were responsible for payment of indigent defense fees. *Id.* at 448. Following *Craig*, the Legislature amended those statutes to provide that city-parishes were not responsible for funding indigent defense.

This court then announced a procedure for ex parte hearings on indigent defense funding and held that if a defendant establishes that expert assistance will be necessary to the construction of an effective defense, a district court is to "authorize the hiring of an expert at the expense of the state." *Touchet*, 642 So.2d at 1216; *see also State v. Frank*, 99-553, p. 10 (La. 1/17/01), 803 So.2d 1, 11 (holding that if the defendant satisfied the *Touchet* standard, the district court was to "order that state funds be procured so that the defendant may hire the requested experts to assist her defense at the sentencing hearing."). The *Touchet* opinion noted that, due to the new funding for the LIDB and the expert witness fund, the opinion would not address the precise source of funding. *Touchet*, 642 So.2d at n.4.

In 1998, the LIDB was reconstituted by the Legislature as the Louisiana Indigent Defense Assistance Board (LIDAB), however, the principal responsibility for providing for indigent defense remained by statute at the local level and the budget of LIDAB was limited. The expert witness fund was discontinued due to a lack of funding.

In 2005, this court reviewed a lower court's determination that the post-*Craig* amendments were unconstitutional as they barred the court from ordering the use of surplus funds to defray the costs of representation of an indigent defendant. *Citizen*, 898 So.2d at 329. In holding the statutes to be constitutional because they

15

specifically provide the medium in which to seek funding for an indigent defense, the court in *State v. Citizen* reasoned:

> The statutes do not declare that indigent defense costs will not be paid, they simply place this burden on the state. The fact that the legislature has not adequately funded the programs it has created to meet its constitutional mandate does not make the statutes themselves unconstitutional. . . . As stated in *Craig*, the legislature has the constitutional right and authority to declare responsibility for the payment of these costs and it has done so. The mere fact that it has exempted these expenses from the individual parishes does not diminish any of the constitutionally guaranteed rights and freedoms of these defendants or of their attorneys.

*Id.* at 335. The *Citizen* court also provided that if funds could not be identified, a district court could appoint counsel before determining a source of funds and counsel could request that the proceedings be halted. *Id.* at 338-39.

In 2007, the Legislature passed the Louisiana Public Defender Act, creating the Louisiana Public Defender Board with an increased budget and expansive powers to manage indigent defense while maintaining principal responsibility for costs at the local level. La. R.S. 15:141, et. seq. The Louisiana Public Defender Board then reconstituted the capital expert witness fund. As part of the Louisiana Public Defender Act, La. R.S. 15:149 was added. It provides: "Nothing in the provisions of this Part shall be construed to limit or supersede the inherent regulatory authority of the Louisiana Supreme Court provided for in Article V, Section 5 of the Constitution of Louisiana regarding the regulation of the practice of law in the state of Louisiana."

In 2011, in the case of *State v. Carley*, the Louisiana Supreme Court reaffirmed that where a defendant meets the *Touchet* showing of need for a particular expert, "then the court is to order that the funds be provided by the state." *State v. Carley*, 10-2768 (La. 1/7/11), 52 So.3d 81 (per curiam).

In 2022, the Legislature passed La. R.S. 15:168(E)(3), which stated for the first time that: "No court shall have jurisdiction to order the payment of any funds

administered by the office or district public defender for expert witnesses." In 2024, the Legislature scrapped the Public Defender Board and replaced it with a single executive branch officer, the state public defender, appointed by the governor and subject to limited supervision by an oversight board. At this time, the Legislature also added "or for any other reason," to the end of La. R.S. 15:168(E)(3).

**Analysis**

Given the jurisprudence and chronology above, this court agrees with the district court that La. R.S. 15:168(E)(3) is unconstitutional as it infringes upon the courts's constitutionally granted jurisdiction and inherent authority. *See Citizen*, 898 So.2d 336. The Legislature does not have the power to change the original jurisdiction of district courts as fixed by the constitution. *Pope*, 792 So.2d at 720.

The constitutional grant of judicial power and original jurisdiction in felony matters to district courts in Louisiana Constitution Article 5, § 16(A) includes the authority to order the payment of appropriate expert costs for indigent defendants. Louisiana courts have a duty to "ensure that the criminal justice system is functioning in a constitutional manner," including cases involving indigent defendants in our state courts. *Citizen*, 898 So.2d at 338. In exercising its constitutional and inherent authorities, and in the case of reviewing courts its supervisory jurisdiction, the courts have the power to take corrective measures to ensure that indigent defendants are provided with their constitutional and statutory rights. *Id.* at 336. We agree with the district court judge in the instant case who opined that the Legislature "cannot write out the jurisdiction of the Court to review matters directly affecting the rights of a criminal defendant."

As we stated in *Fisher*: "Denying a court the power to decide matters historically considered as falling exclusively within the bailiwick of the judicial branch subverts the power of the judiciary in violation of the separation of powers doctrine." *Fisher*, 395 So.3d at 817. The courts have consistently maintained that the

17

Legislature is to define where indigent defense funding comes from and that the courts have the authority to order that certain resources are necessary for a defendant to receive a constitutionally adequate defense.

Moreover, the statute at issue here violates the defendant's right to access the courts as she is not afforded the opportunity to seek review of the decision by OSPD. La. Const. art. 1, § 22. As noted by the trial court, the method to challenge whether an expert witness is constitutionally necessary is to seek review of the trial court's ruling from the *Touchet* hearing. While the State argues that a court has the power to halt prosecution if it believes a defendant is receiving a constitutionally infirm defense, such a result is extreme and disruptive to the efficient administration of justice. As noted by the trial court, if a criminal prosecution was halted, the progression of the case would then be controlled not by a judge or court but by the state public defender, without recourse. *See Meyer*, 6 So.2d at 716. If this occurs, the statute would abridge the judiciary's "inherent authority," which is authority "reasonably necessary for the exercise of their function as courts." *Fisher*, 395 So.3d at 811.

The State also argues that Louisiana Constitution Article 1, § 13 gives the Legislature the power to make expert witness fee determinations that are not subject to judicial review as it states: "The legislature shall provide for a uniform system securing and compensating qualified counsel for indigents." This single sentence does not indicate that the people of Louisiana sought to curtail the jurisdiction of the courts. In addition, there have been decades of judicial opinions and responsive legislation written in this area of law, inconsistent with this theory. In *Peart*, this court opined that this sentence of Article 1, § 13 simply mandates that the Legislature "do something" to protect the enumerated rights of defendants. 621 So.2d at 786. The court opined:

the provision of a 'uniform system for securing and compensating qualified counsel' is not a right which the individual defendant is entitled to enforce, although the existence of this provision in the constitution may well bolster this Court's existing constitutional, supervisory and inherent authority to ensure that indigent defendants receive the effective assistance of counsel the constitution guarantees them.

*Id.*

## CONCLUSION

The statute enacted by the Legislature in La. R.S. 15:168(E)(3) is inconsistent with the historical analysis and implementation of payment of the expense for indigent counsel. It is contrary to the jurisprudence which holds that the state bears responsibility for the funds required while the courts have the duty to determine what payments are necessary. The statute ultimately infringes on the courts' constitutional authority and inherent power to oversee and manage criminal prosecutions.

## DECREE

Accordingly and for the reasons set forth herein, we find that the Legislature, in enacting La. R.S. 15:168(E)(3), acted outside its authority and contrary to the courts' constitutionally granted jurisdiction to order that indigent defense expenses be paid. The judgment of the trial court declaring the statute to be unconstitutional is affirmed. We remand this matter for further proceedings.

**AFFIRMED AND REMANDED.**

# SUPREME COURT OF LOUISIANA

## No. 2025-KA-00896

## STATE OF LOUISIANA

## VS.

## MAYA JONES

On Appeal from the 32nd Judicial District Court, Parish of Terrebonne

**McCALLUM, J., dissents with reasons.**

I respectfully dissent from the majority's finding that La. R.S. 15:168 E(3) is unconstitutional. In my view, the statute comports with separation of powers principles and recognizes the autonomy vested by the Legislature in the Office of the State Public Defender ("OSPD") to manage its operations. On this basis, I find the statute is constitutional.

The doctrine of separation of powers is not just a philosophical nicety. It has significant practical consequences. The majority, with ostensibly well-meaning motives, has now sanctioned the encroachment by one branch of government upon the authority vested in each of the other two branches. In doing so, the majority's opinion eviscerates the ability of our state to meaningfully prosecute defendants facing capital charges. Perhaps that is the ultimate purpose. Today's opinion gives trial judges carte blanch to order executive branch expenditures of taxpayer dollars for non-capital cases, even where a defendant is represented by private counsel.

The United States Supreme Court in *Gideon v. Wainwright*, 372 U.S. 335 (1963), held that the right to counsel is a fundamental right essential to a fair trial, and that the Sixth Amendment's guarantee of counsel is made obligatory on the states through the Fourteenth Amendment. "Louisiana responded [to *Gideon*]. . . by creating a state indigent defender board (formerly, La. R.S. 15:141 *et seq.*) in 1966 and, within a decade, by enacting La. Const. Art. I § 13." *State v. Citizen*, 04-1841,

p. 5 (La. 4/1/05), 898 So. 2d 325, 330. Our Constitution's Declaration of Rights, set forth in Article I, contains the "Rights of the Accused" in Section 13. Among those rights is the "right to the assistance of counsel and, if indigent, [the] right to court appointed counsel."

The State's obligation to provide counsel also requires that an indigent defendant's attorney be supplied, at no expense to the defendant, with the "basic tools of an adequate defense." *State v. Touchet*, 93-2839, p. 3 (La. 9/6/94), 642 So. 2d 1213, 1215 (quoting *Britt v. North Carolina,* 404 U.S. 226 (1971)). While the *Touchet* Court acknowledged that indigent defendants have a right to receive funds for expert testimony, it specifically declined to make any findings as to where those funds are derived. Instead, the Court stated:

> It is the state's obligation to furnish the necessary funds to pay the cost of experts needed to assist counsel for indigent defendants. This opinion does not purport to deal with the precise source of funds or governmental entities responsible therefor. . . .

*Id*., 93-2839, p. 15 n.4, 642 So. 2d at 1222.

As the State points out, this matter "arises from a request for expert funding by an indigent defendant who has retained private counsel in a non-capital case." Accordingly, the majority's decision in this matter effectively creates a hybrid system where clients who have retained counsel are entitled to a monetary supplement at the taxpayers' expenses for the costs of litigation. *Gideon* never anticipated such a mutation.

Furthermore, the majority's decision is inconsistent with the separation of powers doctrine. As the majority correctly notes, under the separation of powers doctrine, none of the three branches of government may exercise powers belonging to any of the others. The majority's decision, however, allows the judiciary to intrude upon powers constitutionally reserved to each of the other branches–the Legislative and Executive branches–in clear violation of our system of separated powers.

2

Among the authority vested in the legislature is the exclusive control of public funds,[1] as was acknowledged in *Hoag v. State*, 04-0857, p. 8 (La. 12/1/04), 889 So. 2d 1019, 1024, (our Constitution "grants sole authority to the legislature to control the funds of this state and to appropriate funds within its control."). When the Legislature expressly appropriates funds for a specific purpose, our case law makes clear that a court may issue an order directing that those funds be expended without violating the separation of powers doctrine. Where funds have been appropriated by the Legislature *without* being designated for a specific use, however, a court order directing the recipient of those funds to spend them in a particular manner violates the separation of powers doctrine.

In this case, the trial court's order, directing the OSPD to spend its own funds in a specific manner–to pay for expert fees requested by the defendant–represents exactly that type of encroachment on the separation of powers that La. R.S. 15:168 E(3) was designed to protect. A review of the statutory framework for capital cases confirms that the authority to make decisions concerning expert witnesses and the payment of their fees lies exclusively with the OSPD and not with the courts.

When the Legislature enacted the Louisiana Public Defender Act ("LPD Act"), it delegated to the OSPD the authority to "adopt all rules necessary to implement [it]." La. R.S. 15:148 A. In response to this mandate, the Public Defender Board adopted the Capital Defense Guidelines, 22 LAC Pt XV, § 901, *et seq*. Included within those guidelines is the requirement that "[c]ounsel . . . have access to the assistance of all expert . . . services reasonably necessary to provide high quality legal representation at every stage of the proceedings." 22 LAC Pt XV, § 913 B(1). Importantly, the OSPD adopted the rule that "[t]he state public defender

---

[1] La. Const. art. III, §§ 1 & 16(A) provide that legislative power is vested in the legislature and that no money may be drawn from the state treasury except pursuant to a specific appropriation made by law.

3

**shall** provide funds for the assistance of experts,. . . ." 22 LAC Pt XV, § 913 B(2).[2] (Emphasis added). These provisions make clear that the OSPD expressly accepted responsibility for the payment of experts in capital cases.[3] However, there is no corresponding provision requiring the payment of experts in non-capital cases by the OSPD, particularly to those, as is the case here, who are privately represented.

Furthermore, even where the OSPD assumed responsibility for providing funds for experts in capital cases, the OSPD retains discretion over how it spends those funds which were allocated to it but were not earmarked for any particular purpose. *See* footnote 2 (the Louisiana Administrative Code has provisions for the review of a denial of a request for an expert witness, implicitly recognizing the OSPD's authority to determine when it will expend funds for experts); *See also*, *e.g.*, *Newman Marchive P'ship, Inc. v. City of Shreveport*, 07-1890, p. 10 (La. 4/8/08), 979 So. 2d 1262, 1268-69 (where the City of Shreveport created a fund for the general payment of claims or judgments against the city without designating any of the funds for specific claims, mandamus would not lie, as "any judicial order compelling the City to pay those funds would constitute an unconstitutional seizure of public funds. . . .[O]nce funds were appropriated . . ., discretion remained with

---

[2] Under the guidelines set forth in the Louisiana Administrative Code for the funding of expert witnesses *for indigent defendants who have been sentenced to death*, a provision exists for the review of a denial of a request for an expert witness. Pursuant to 22 LAC Pt XV, § 207 A: "Should an application for funding under § 205.A be denied in part or full, the applicant has 30 days from the date of the letter notifying applicant of denial to request in writing that the application be reviewed by the director of the Louisiana Indigent Defense Assistance Board." Notably, the "[d]ecisions of the director are final." *Id*. (The Louisiana Indigent Defense Assistance Board became the Louisiana Public Defender Board in 2007. In a 2024 revision to the laws governing public defense, the Louisiana Public Defender Board was abolished and the OSPD was created).

[3] No case has expressly held that the Capital Defense Guidelines have the force of law. However, the legislature tasked the OSPD with "[c]reating mandatory statewide public defender standards and guidelines that require public defender services to be provided in a manner that is uniformly fair and consistent throughout the state." La. R.S. 15:148 B(1). This language is tracked among the express objectives of the Capital Defense Guidelines: "to create mandatory statewide guidelines and performance standards for the defense of capital cases as required by R.S. 15:148(B)(10) in order to ensure high quality legal representation for all persons facing the possible imposition or execution of a death sentence in a manner that is uniformly fair and consistent throughout the state." 22 LAC Pt XV, § 901 A(1). The guidelines are "principally intended to focus on the structure of capital defense service delivery. . . ." 22 LAC § 901 A(2).

the Risk Management Committee to determine if those funds should be disbursed, how, when, and to whom.").

The funds at issue are partly allocated to the OSPD by the legislature and partly derived from other sources (such as fines). None of these funds have been designated for any particular purpose. As a result, and because the Legislature has otherwise vested the OSPD with autonomy over its operations, in my view, La. R.S. 15:168 E(3) was validly enacted under the Legislature's authority, does not impermissibly encroach upon the jurisdiction of the courts, and comports with the concept of separation-of-powers principles.

This Court recently reiterated in *Watson Mem'l Spiritual Temple of Christ v. Korban*, 24-00055, p. 10 (La. 6/28/24), 387 So. 3d 499, 507, *reh'g denied*, 24-00055 (La. 8/2/24), 390 So. 3d 277, and *cert. denied*, 145 S.Ct. 1169 (2025) (Citations omitted), that "[w]hen litigants seek to invoke the power of the judiciary to compel another branch of government to perform or act, we must closely and carefully examine whether the action is within the confines of our constitutional authority." These principles apply with equal force to legislation purporting to constrain the judiciary.

As observed by the majority, the judicial power of our courts is derived "from [either] an express constitutional grant or from inherent judicial power reasonably necessary for the exercise of their function as courts." *State v. Umezulike*, 03-1404, p. 4 (La. 2/25/04), 866 So. 2d 794, 797. Here, there is no express constitutional grant to the courts of the power to order an executive agency to expend funds in a particular manner. Accordingly, for this judicial power to exist, it must arise from the court's "inherent power" which is "reasonably necessary for the exercise of their function as courts."

The "inherent judicial powers of the courts are not enumerated in the Louisiana Constitution." *Konrad v. Jefferson Parish Council,* 520 So.2d 393, 397

5

(La. 1988). Our case law explains, however, that the "judiciary's inherent power is a necessary concomitant to the judicial power, *but pertains to the administration of the business of the courts*." *Chavez v. Metso Minerals Indus., Inc.,* 23-01029, p. 12, (La. 10/24/24), 395 So. 3d 771, 890, *reh'g denied*, 23-01029 (La. 12/12/24), 397 So. 3d 306 (quoting *Bester v. Louisiana Supreme Court Comm. on Bar Admissions*, 00-1360, p. 3 (La. 2/21/01), 779 So. 2d 715, 717. (Emphasis added).

In *State in Interest of A.C.*, 643 So. 2d 719, 732 (La. 1994), *on reh'g*, 93-1125 (La. 10/17/94), 643 So. 2d 743, we explained that "the core function of the judiciary is the administration of justice between litigants." Additional functions of the courts allowed by the "doctrine of inherent powers" were noted in *Konrad v. Jefferson Parish Council,* 520 So.2d 393, 397 (La. 1988): "to provide the power to punish for contempt, to adopt rules of practice, to regulate lawyer admission to practice and lawyer discipline, and to require the appropriation or expenditure of funds reasonably necessary for the court's functioning as a court." It is also readily apparent that other clear judicial functions include presiding over trials, rendering judgments, discretion in litigation, making procedural rulings, and applying and interpreting the law.

Not all court-related activities are considered functions of the court. In *Umezulike, supra*, for example, at issue was whether a statute delegating the authority to issue a search warrant to the commissioner of a judicial district (a non-judicial officer) violated the separation of powers doctrine, as that power is traditionally reserved to elected judges. This Court found that the issuance of a search warrant is not an inherent judicial power which courts exercise exclusively. The Court explained: "the issuance of search warrants is not a power necessary to exercise the jurisdiction of the court, nor does it interfere with the independence of the judiciary." *Umezulike*, 03-1404, p. 9, 866 So. 2d at 801.

6

By contrast, in *State in Interest of A.C.*, *supra*, the Court addressed a statute enacted in 1992 (La. R.S. 9:364 D), which required courts to afford greater weight to a child's treating therapist on visitation-related issues. Finding that the statute violated the constitutional system of separation of powers, the Court stated:

> [T]he court is vested with whatever inherent powers "necessary for the exercise of its jurisdiction[.]" These powers include the inherent power to assign various weights to evidence it deems credible, no matter what the source. La. C.C.P. art. 191. By its command that the court assign a particular weight to the evidence before it to the exclusion of any other testimony (whether individual or cumulative), the statute is infringing upon this inherent power of the judiciary.

*Id.*, 643 So. 2d at 734. *See also*, *Safety Net for Abused Persons v. Segura*, 96-1978, p. 11 (La. 4/8/97), 692 So. 2d 1038, 1044 (statute which imposed an additional filing fee to support a program to provide aid to domestic violence victims was unconstitutional, as it violated the separation of powers doctrine; the fee was not "sufficiently related to the administration of the criminal justice system to warrant" its imposition).

When these principles are applied to the instant matter and La. R.S. 15:168 E(3) is examined through a constitutional lens, it is clear that the statute withstands constitutional scrutiny and conforms with the district court's lack of authority to issue an order directing the OSPD, an agency of the executive branch, to expend funds in any particular manner, including for expert witnesses. The statutory framework for the OSPD reflects the Legislature's intent to vest it with full operational authority and autonomy, encompassing the power to control the use and expenditure of its funds. Thus, the statute preserves that authority and neither encroaches upon the judicial power vested by the constitution nor violates the separation of powers doctrine.

Nor does an order directing the OSPD to expend funds fall within what is reasonably necessary for the proper exercise of the court's judicial functions.

Although there are no specific parameters for determining what constitutes the exercise of a court's judicial functions, it is readily apparent that a court's directing how an executive agency spends its own funds, even if that expenditure pertains to the defense of an indigent defendant, is not a "function" of the court. To hold otherwise would, in effect, permit the court to interfere with agency budgeting decisions, and dictate or control the manner in which the defense of a defendant is conducted, a function reserved to the OSPD (*i.e.,* the court's exercise of authority belonging to another branch of the government).

The OSPD's autonomy is clearly evident in the designation of its powers and duties, set forth in La. R.S. 15:147. Generally, in subpart A, the legislature granted the OSPD:

> all regulatory authority, control, supervision, and jurisdiction, including auditing and enforcement, and all power incidental or necessary to such regulatory authority, control, supervision, and jurisdiction *over all aspects* of the delivery of public defender services throughout the courts of the state of Louisiana.

La. R.S.15:147 A. (Emphasis added). Subpart B then sets forth a comprehensive list of specific powers of the OSPD and outlines certain duties of the OSPD, including:

- adopting "all rules necessary to implement the provisions of this Part as provided in R.S. 15:148 and in accordance with the Administrative Procedure Act. (La. R.S. 15:147 B(2);

- budgeting (La. R.S. 15:147 B(3));

- incurring "such expenses and obligations, within the fiscal limits available to the office, as are necessary to the efficient and thorough regulation and governance of public defender services. . . and establish and maintain an accounting system which complies with the law" (La. R.S. 15:147 B(6));

- allocating funding to the public defenders, contract programs, and other entities as necessary for the implementation the LPD Act (La. R.S. 15:147 B(15)); and

- supervising the activities of staff and applying reasonable controls for the supervision of spending, accounting, and discretionary grants; which supervision includes "reviewing details regarding expert witness funds or other case-specific grants" (La. R.S. 15:147 B(17).

Under the LPD Act, a state public defender is appointed by the governor (La. R.S. 15:152 A) and his duties are set forth in La. R.S. 15:152 B. They include the duty to:

- "[e]tablish and maintain, in a cost-effective manner, the delivery of legal services to persons entitled to, and financially eligible for, appointed counsel in criminal proceedings at state expense. . . ." (La. R.S. 15:152 B(1));

- prepare the budget of the office (La. R.S. 15:152 B(4));

- "[n]egotiate contracts, as appropriate, for providing legal services to persons financially eligible for appointed counsel at state expense" (La. R.S. 15:152 B(5)); and

- "[e]mploy personnel or contract for services as necessary to carry out the responsibilities of" the LPD Act (La. R.S. 15:152 B(6).

The LPD Act also provides for the "Louisiana Public Defender Fund" and the "Judicial district indigent defender fund." The former is established within the state treasury and is designed to support public defense statewide; it is to be "appropriated, administered, and used solely and exclusively for purposes of the" LPD Act. La. R.S. 15:167 A. At least seventy-five percent of the entirety of the fund's annual budget is to be "dedicate[d] and disburse[d]" by the OSPD to the offices of the district public defenders and their indigent defender funds. La. R.S. 15:167 E.

Each judicial district has an indigent defender fund, which is to be administered by the local district public defender for each district and is "composed of funds provided for by this Section and such funds as may be appropriated or otherwise made available to it." La. R.S. 15:168 A. Subpart B sets forth the manner by which the funds are to be provided.[4] The funds generated in accordance with this

---

[4] La. R.S. 15:168 B (1)(a) provides:

> Every court of original criminal jurisdiction, . . . shall remit the following special costs to the district indigent defender fund for the following violations, under state statute as well as under parish or municipal ordinance, except a parking violation. Except as provided in Subparagraph (b) of this Paragraph, the sum of forty-five dollars shall be assessed in cases in which a defendant is convicted after a trial, a plea of guilty or nolo contendere, or after forfeiting bond and shall be in addition to all other fines, costs, or forfeitures imposed.

statute "shall be retained in the district and *shall be used and administered by the district public defend*er." La. R.S. 15:168 C. (Emphasis added). Those funds are to be "administered and used solely and exclusively for purposes of delivering indigent defender services in that judicial district." La. R.S. 15:168 D. Any funds not expended at the close of each fiscal year "shall remain in the judicial district indigent defender fund." *Id*.

The right to funding for expert witnesses was judicially created in *Touchet*, *supra*, (although the focus of the case was on whether a defendant has a right to an *ex parte* hearing on a motion for state funding of expert witnesses), as observed by the majority. Importantly, again, the *Touchet* Court did not make any findings with respect to where those funds are derived.

Later, this Court expounded on the funding for indigent defendants in *State v. Citizen*, 04-1841 (La. 4/1/05), 898 So. 2d 325. At issue in *Citizens* were two statutes which prevented the use of local parish funds (in Calcasieu Parish) to pay for counsel appointed to represent indigent defendants.[5] Appointed counsel for the defendants filed a motion to determine the source of funds for competent defense, pointing to the lack of available funding for indigent defense.[6] The trial court found the statutes to be unconstitutional as they deprived the defendants of their right to a fair trial. It then ordered the Calcasieu Parish Police Jury to pay for the defense attorney fees

La. R.S. 15:168 B (1)(a).

[5] One statute (La. R.S. 15:304) provides that all expenses "incurred. . . by the arrest, confinement, and prosecution of person accused or convicted of crimes, their removal to prison, the pay of witnesses specifically provided by law, jurors and all prosecutorial expenses whatever attending criminal proceedings shall be paid by the respective parishes in which the offense charged may have been committed. . . ." The other (La. R.S. 15:571.11) provides that all "fines and forfeitures. . . shall be paid into the treasury of the parish in which the court is situated and deposited in a special 'Criminal Court Fund' account, which, on motion by the district attorney and approval order of the district judge, may be used or paid out in defraying the expenses of the criminal courts of the parish. . . ."

[6] In *Citizens*, an ad valorem tax made up the largest component of the Criminal Court Fund, which maintained the court system and also funded the District Attorney's office. The local public defender, however, was funded through court fees and funds allocated by the state, and it operated at a deficit.

10

and expert witness fees. This Court reversed, and finding the statutes to be constitutional, stated:

> The statutes do not declare that indigent defense costs will not be paid, they simply place this burden on the state. The fact that the legislature has not adequately funded the programs it has created to meet its constitutional mandate does not make the statutes themselves unconstitutional. Further, while the statutes prohibit the parishes from being required to pay for indigent defense, nothing in the statutes prohibit the parishes from paying these expenses if they so chose. As stated in *Craig*, the legislature has the constitutional right and authority to declare responsibility for the payment of these costs and it has done so. The mere fact that it has exempted these expenses from the individual parishes does not diminish any of the constitutionally guaranteed rights and freedoms of these defendants or of their attorneys.

*Id.*, 04-1841, pp. 12-13 (La. 4/1/05), 898 So. 2d 325, 335. The Court then turned to the question of whether the trial court exceeded its constitutional function in ordering the police jury to set aside funds for indigent defense. The Court first observed that our Constitution "explicitly places the duty of providing a working system for securing the representation of indigent defendants squarely on the shoulders of the legislature." *Id.*, 04-1841, p. 13, 898 So. 2d at 335; *see also*, La. Const. Art. I § 13, *supra*. The Court next observed that, while the legislature may have been in breach of its duty to compensate counsel for indigent criminal defendants, "a trial court may not reach into a local parish's accounts when constitutionally prohibited by the legislature." *Id.*, 04-1841, p. 13, 898 So. 2d at 336. The Court then found the trial court erred in ordering the police jury to place funds in the court registry to pay the court-appointed attorneys and other expenses:

> The legislature has clearly determined through statutory enactments that the State, not the parishes, will pay for indigent defense pursuant to the constitutional mandate of La. Const. Art. I, § 13. This could not be clearer given the legislative amendments of La. R.S. 15:304 and 15:571.11 in direct response to this Court's ruling in *Craig* that those statutes, before amendment, required the parishes, first through the criminal court funds in La. R.S. 15:571.11 and then through the general funds in La. R.S. 15:304, to

11

> provide funding for indigent defense where the State Indigent Defender Boards lacked the resources.

*Id.*, 04-1841, p. 14, 898 So. 2d 336.

Notably, the Court indicated that, although the trial court was without authority to "force" the police jury to pay the costs, nothing prevented it from doing so. And if there are insufficient funds available, a defendant may file a motion to halt the prosecution until adequate funding is available and the trial judge "may thereafter prohibit the State from going forward with the prosecution until he or she determines that appropriate funding is likely to be available." *Id.*, 04-1841, p. 17, 898 So. 2d 339.[7] Although these cases pre-date the enactment of the LPD Act in 2007, courts have continued to follow *Touchet* to require hearings to determine a defendant's need for expert funding and some have continued to find that courts may order funds to be provided by the state. *See*, *e.g.*, *State v. Dyas*, 53,597 (La. App. 2 Cir. 1/13/21), 309 So. 3d 955, *writ denied*, 21-00256 (La. 5/4/21), 315 So. 3d 222; *State v. Carley*, 10-2768 (La. 1/7/11), 52 So. 3d 81.

The LPD Act has been amended several times, including the 2024 revision of La. R.S. 15:168 E(3), which, as amended, provides that "[n]o court shall have jurisdiction to order the payment of any funds administered by the Louisiana Public Defender Board or district public defender for expert witnesses, or for any other reason." Among the express legislative findings made in enacting the LPD was the goal of "ensuring adequate public funding of the right to counsel is provided and managed in a cost-effective and fiscally responsible manner" and "ensuring that the public defender system is free from undue political and judicial interference." La.

---

[7] In enacting the LPD Act, the legislature acknowledged that the Citizens case "authorized trial judges to halt prosecutions in capital cases, upon motion of defense counsel, until adequate funding is provided to ensure an adequate defense." La. R.S. 15:142 D. And, among the legislative findings for the LPD Act is an express intention to ensure adequate resources, consistent with the Citizen opinion, which allow prosecutions in such cases to continue to conclusion resulting in verdicts that are fair, correct, swift, and final." *Id.*

R.S. 15:142 B(1) and (2).[8] A court order that infringes on the OSPD's ability to control how it spends funds is precisely the type of "undue . . . judicial interference" that the legislature specifically sought to avoid in enacting the LPD Act.

In establishing a centralized system for public defense, it is clear that the Legislature intended to vest both the OSPD and the district public defenders with autonomy in the management of their operations, including making all decisions bearing on the representation of indigent defendants. While the LPD Act does not dictate the precise manner by which the OSPD shall operate or how its funds are to be used, reserving those decisions to the OSPD itself, the autonomy afforded to it necessarily encompasses fiscal decision-making.

This authority is patently evident in R.S. 15:147 A which gives the OSPD "all power incidental or necessary to such regulatory authority, control, supervision, and jurisdiction over *all aspects of the delivery of public defender services*." (Emphasis added). Our case law further recognizes that both the OSPD and the district public defenders "are given substantial latitude to determine the delivery of public defender services." *State v. Singleton*, 15-1099, p. 10 (La. App. 4 Cir. 5/25/16), 216 So. 3d 985, 992. Included within that latitude is the authority to incur expenses and allocate funding.[9]

The OPSD's authority over expenditures is more explicitly set forth in La. R.S. 15:167 C, as is the authority of the district public defenders set forth in La. R.S. 15:168 C. The former requires the OSPD to "dedicate and disburse at least seventy-five percent of the entirety of its annual budget and its funds in the LPD Fund . . .

---

[8] The guidelines set forth in the Administrative Code, too, recognize that defense counsel should ensure that "the performance of the defense function is free from judicial interference." 22 LAC Pt XV, § 903 C(2); *see also*, *State v. McCoy*, 14-1449 (La. 10/19/16), 218 So. 3d 535, rev'd on other grounds, *Robert Leroy Mccoy v. Louisiana*, 584 U.S. 414 (2018).

[9] Again, to confirm the autonomy vested in the OSPD, with respect to the funding of expert witnesses for indigents convicted of capital crimes, the Appeals Procedure in the Administrative Code expressly state that the "[d]ecisions of the director [in review of a denial of an application for funding for an expert] are final." 22 LAC Pt XV, § 207.

each fiscal year to the offices of the district public defenders and their indigent defender funds . . . in the various judicial districts throughout the state" La. R.S. 15:167.s that the Louisiana Public Defender Fund "shall be administered by the office [of the state public defender]. . . ." The latter states that the judicial district public defender funds within the judicial districts "and any other self-generated revenue and all interest or other income earned from the investment of such funds and self-generated revenue shall be retained in the district and shall be used and administered by the district public defender."

These statutes reflect a legislative intent to vest the agency—not the judiciary—with primary responsibility for managing the financial and administrative aspects of indigent defense. To permit the judiciary to override those determinations by directing how public defense resources are allocated and used would intrude upon the authority the legislature has expressly vested in the OSPD, an executive branch agency, and would contravene the separation of powers established by the constitution. As one court recently noted (in finding that a district court judge was without authority to order that a specific attorney represent an indigent defendant), "[t]he administration of the court proceedings is within the purview of the judge. The administration of representation is within the purview of the lawyers. *See* Louisiana Public Defender Act, La. R.S. 15:141 *et seq*." *State v. Brown*, 21-0230, p. 6 (La. App. 4 Cir. 4/27/21), 317 So. 3d 893, 897. Other decisions highlight the autonomy of the office of the public defender. *See, e.g., State v. Lewis*, 09-1978 (La. 9/23/09), 18 So. 3d 67; *State v. Brasley*, 09-1847 (La. 8/24/09), 17 So. 3d 941, 941.

I would also note that an order directing the OSPD to pay for expert fees is tantamount to the issuance of a mandamus. Under La. C.C.P. art. 3863, a writ of mandamus may be directed to a public officer to compel the performance of a ministerial duty required by law. A ministerial duty is one which there is no element

14

of discretion left to the public officer. *Hoag*, 04-0857, p. 7, 889 So. 2d at 1024. Mandamus is to be used "only when there is a clear and specific legal right to be enforced or a duty that ought to be performed." *Bonvillian v. Dep't of Ins.*, 04-0332, p. 4 (La. App. 1 Cir. 2/16/05), 906 So. 2d 596, 599. When the legislature has appropriated funds for a specific, designated purpose, the duty to use those funds is considered ministerial and courts may issue writs of mandamus to enforce the payment of those sums, even against the state. Where there has been no express appropriation of funds for a designated purpose, however, courts have consistently rejected mandamus to force payment.

In *Jazz Casino Co., L.L.C. v. Bridges*, 16-1663 (La. 5/3/17), 223 So. 3d 488, for example, the district court issued a mandamus ordering the Secretary of the Department of Revenue to pay a judgment granting a refund to a taxpayer of several years of overpaid hotel occupancy taxes. The court of appeal reversed based on a lack of evidence. In reinstating the district court's judgment, this Court considered whether the judiciary could compel the Secretary of the Treasury, a member of the executive branch, to pay the taxpayer's refund. The Court first observed that the legislature was tasked under La. Const. art. VII, § 3(A) with "provid[ing] a complete and adequate remedy for the prompt recovery of an illegal tax paid by a taxpayer." *Id.*, 16-1663, p. 5, 223 So. 3d at 492. Under the system created by the legislature, when a refund judgment becomes final, the Secretary is "statutorily required to 'promptly . . . make the refund.'" *Id.*, p. 9, 223 So. 3d at 494. The Court found this duty to pay to be ministerial, as the Secretary has no discretion in the return of taxes determined to have been overpaid.

Similarly, the recent case *Mellor v. Par. of Jefferson*, 22-01713 (La. 9/1/23), 370 So. 3d 388, involved the collection of fines under a Jefferson Parish "School Bus Safety Enforcement Program" that was held to be unconstitutional. The district court ordered the Jefferson Parish School Board and Sheriff's Office to return and

15

remit into the registry of the court approximately $2.78 million collected under the program. This Court held that the trial court's order improperly intruded upon the authority belonging to the legislative and executive branches, finding "no specific constitutional or statutory provision permit[ting] the trial court to order the defendants to remit into its registry the $2,780,232.02" and "no authority. . . to justify the judiciary's encroachment into the exclusive dominion of a governmental authority to appropriate funds to pay judgments under La. Const. art. XII, § 10 and La. R.S. 13:5109 B (2)." *Id*, 22-01713, p. 14, 370 So. 3d at 397.

Thus, the *Mellor* Court found that the order, issued with neither specific constitutional nor statutory authority, amounted to a constitutional overreach by the trial court. *See also*, *Hoag*, 04-0857, p. 8, 889 So. 2d at 1025, (the court lacked authority to issue a writ of mandamus compelling the legislature to appropriate the funding for the statutorily authorized supplemental salaries of coroners, as the act of appropriating funds is not ministerial, but rather, a "legislative action which is within its discretionary province and constitutional authority."); *Newman Marchive*, *supra*.

Conversely, mandamus was found to be appropriate in *New Orleans Fire Fighters Pension & Relief Fund v. City of New Orleans*, 14-0142 (La. 3/21/14), 131 So. 3d 412, to compel the City of New Orleans to contribute sums to the pension fund of firefighters that were statutorily mandated. The court found the City's obligation to contribute to be a ministerial duty, and thus mandamus was not "an improper usurpation of a legislative function and does not violate the separation of powers doctrine." *Id*., p. 15, 135 So. 3d at 422.

These cases illustrate when the judiciary may constitutionally compel payment and, by contrast, why judicial orders compelling indigent-defense expenditures are improper. The former recognizes orders to pay pursuant to a ministerial statutory duty; the latter overrides the discretion that has been legislatively delegated to the OSPD. Unlike those cases where mandamus was

16

appropriate, here, decisions with respect to the funding of indigent defense, including expert funding, are inherently discretionary and are expressly vested by statute in the public defender system.

Because the legislature has vested the OSPD with exclusive authority to determine how and which experts are to be paid, La. R.S. 15:168 E(3)–barring a court from ordering the payment for expert witnesses–is consistent with the intended statutory scheme. By ordering the public defender to pay for an expert, a court impermissibly overrides the legislature's mandate vesting decision-making with the public defender. Accordingly, in my view, the Legislature, in promulgating La. R.S. 15:168 E(3), acted within its authority to preserve the autonomy it vested in the office of the state public defender to manage its operations.

To the extent the LPD Act does not provide a specific remedy to a defendant whose request for funding for an expert is denied, this is a matter for the Legislature to address.

Furthermore, a defendant whose request for funding has been denied is not without resources. First, as noted, *Citizens* indicated that a defendant may halt the prosecution until adequate funding is available and a trial court may prohibit the State from continuing with the prosecution until such time as finding is available.

Second, there is a reasonable safeguard to this issue–denying an indigent defendant access to a specific expert could later form the basis for an ineffective assistance of counsel claim. *See*, *e.g.*, *State v. Curley*, 16-1708, p. 10 (La. 6/27/18), 250 So. 3d 236, 250 (defense counsel provided ineffective assistance by not considering or seeking out expert testimony that "could have been relevant to defendant's state of mind and the reasonableness of her actions."). Consequently, the OSPD is presumed to act with due regard for a defendant's constitutional right to effective representation. And a defendant who is convicted after having been

17

denied a requested expert may assert a due process claim (presuming it can be shown that the expert would have affected the outcome of the case).

For these reasons, I respectfully dissent.

# SUPREME COURT OF LOUISIANA

## No. 2025-KA-00896

## STATE OF LOUISIANA

## VS.

## MAYA JONES

*On Appeal from the 32nd Judicial District Court, Parish of Terrebonne*

**GRIFFIN J., additionally concurs and assign reasons.**

"The legislature shall provide for a uniform system for securing and compensating qualified counsel for indigents." La. Const. art. I § 13. Contrary to the State's arguments, this clause was not intended to limit the power of the courts to protect individual rights. *State v. Peart*, 621 So. 2d 780, 786 (La. 1993). The original purpose of this language was to protect those accused of crimes and to place criminal defendants on balance with the State.[1] It would be absurd to read it as limiting the rights of the accused.

Further, as here, it is not uncommon for courts to issue mandamus orders for unfunded mandates listed in the Constitution. *See Watson Mem'l Spiritual Temple*

---

[1] This provision was intended as a mandate to the legislature to do something, "where it belongs." Transcript Records of the Louisiana Constitutional Convention of 1973, volume VII, page 1160, September 7, 1973, 43rd Day of the Proceedings. The framers agreed that it was "not an attempt to suppress or supplant [the rest of article I section 13]...it's a supplement." *Id*. The framers agreed the intent was "to help poor citizens who have been accused of crime." *Id*. at 1160; and *Id*. at 1160-1162 (general discussion). Delegate Velazquez, who drafted the clause, stated "[t]he purpose of this amendment is to help all those segments of society in the greatest need of help." *Id*. at 1160. The amendment passed overwhelmingly 99-11. See *Id*. at 1162. Discussion as to an earlier draft of this language reveals it was intended to require balance between the state and the defense. Transcript Records of the Louisiana Constitutional Convention of 1973, volume VI, page 928-933, August 24, 1973 36th Day of the Proceedings (full discussion); *See Id*. at 928 ( Statement by Delegate Velazquez, author of the final version, "This preserves the rights of the accused and it protects an ordinary citizen who might be accused of a crime which he did not commit...We try to balance the prosecution against the defense); *and see Id*. at p. 931 (Statement by Delegate Stagg noting the provision could require equality with the prosecution). These earlier drafts were rejected because the convention agreed it was better suited for the declaration of rights, as opposed to the judiciary article. This earlier discussion was not cited by the Court in *Peart* or by the parties, likely because it is labeled in the appendix of the convention records as being about district attorneys. Records, Volume XIV B page 1606.

*of Christ v. Korban*, 24-0055 (La. 6/28/24), 387 So. 3d 499; *Jazz Casino Co., L.L.C. v. Bridges*, 16-1663 (La. 5/3/17), 223 So. 3d 488; Lee Hargrave, *"Statutory" and "Hortatory" Provisions of the Louisiana Constitution of 1974*, 43 LA. L. REV. 647, 656-57 (1983). Where courts issue rulings as to the contours of constitutional provisions using mandatory language (just as when a statute sets the contours of statutory obligations) there is no discretion on the part of the government, and the courts can issue mandamus orders. Here, that mandatory clause is the due process clause. La. Const. art. I § 2.

**SUPREME COURT OF LOUISIANA**

**No. 2025-KA-00896**

**STATE OF LOUISIANA**

**VS.**

**MAYA JONES**

**On Appeal from the 32nd Judicial District Court, Parish of Terrebonne**

**Cole, J., dissents for the reasons assigned by McCallum, J.**